UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

MATTHEW MCKINNEY,                                   CIVIL NO. 02-4269 (ADM/JSM)
through his parent and legal
guardian, Tammy Emery

          Plaintiff,

v.                                                            REPORT AND
                                                             RECOMMENDATION

SCHOOL BOARD OF
INDEPENDENT SCHOOL
DISTRICT NO. 11,

          Defendant.


          JANIE S. MAYERON, U.S. Magistrate Judge

          This matter came on for hearing before the undersigned United States Magistrate

Judge on defendant's Motion for Judgment on the Administrative Record/Summary

Judgment [Docket No. 79] and plaintiff's Motion for Judgment in Favor of the Plaintiff on

an Expanded Record or to Set Matter for Trial [Docket No. 90].  Sonja D. Kerr, Esq.

appeared on behalf of plaintiff; Amy E. Mace, Esq. appeared on behalf of defendant.[1]

          This matter has been referred to the undersigned Magistrate Judge for a Report

and Recommendation by the District Court pursuant to 28 U.S.C. §636(b)(1)(B) and

Local Rule 72.1(c).  For the reasons discussed below, it is recommended that:

          1.      Defendant's Motion for Judgment on the Administrative Record/Summary

Judgment [Docket No. 79] be **GRANTED**; and

---

[1]      The parties in this matter waived having hearing on the above motions and
agreed to the matter decided on the written submissions.

2.      Plaintiff's Motion for Judgment in Favor of the Plaintiff on an Expanded Record or to Set Matter for Trial [Docket No. 90] be **DENIED**.

I.      **FACTUAL BACKGROUND**

A.      **Procedural Background**

Plaintiff, Matthew McKinney's ("McKinney"), action against School Board of ISD #11 Anoka-Hennepin ("School District") arises out of his appeal from three decisions from Hearing Review Officers ("HRO") in Minnesota Department of Children, Families, and Learning ("MDCFL") Case Nos. 390, 424, and 487.  McKinney contests the findings of these three administrative hearings relating to his access to a free appropriate public education ("FAPE") as required by the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. §§ 1400 et seq.

In MDCFL Case No. 390, an Independent Hearing Officer ("IHO"), presided over a due process hearing requested by McKinney regarding an assistive technology assessment, modifications in the regular classroom, and parental participation in IEP meetings.  The hearing was held on August 25, 28, 29 and September 1, 2000 and the IHO found for the District.  McKinney appealed the decision reached in MDCFL Case No. 390 to the HRO who upheld the IHO's decision on December 15, 2000.  In this regard, the HRO found that (1) the School District did not inhibit the ability of McKinney's mother to participate in the Individualized Education Plan ("IEP") process; (2) although the School District had delayed in providing McKinney with an assistive technology evaluation, he was not entitled to relief;   (3) the School District was not required to ensure that plaintiff received Extended School Year ("ESY") services while he was in Las Vegas, Nevada; and (4) McKinney had received the provision of

accommodations and modifications in regular education classrooms, except for the Picture Exchange Communication System. See Affidavit of Stacey L. Wilson ("Wilson Aff."), Ex. 2, at pp. 5-9; see also First Amended Complaint, at p. 4, ¶ 9.

In March 2001, McKinney requested a second due process hearing, MDCFL Case No. 424, which focused on the training of the paraprofessionals assigned to McKinney. The hearing was conducted on June 11-12, 2001, and the IHO again found for the District. The HRO upheld the IHO's decision on September 18, 2001. With respect to MDCFL Case No. 424, McKinney challenged the School District's decision to replace an experienced paraprofessional who had received significant training with DynaMyte, McKinney's augmentative communication device, with two paraprofessionals who allegedly lacked such training. See First Amended Complaint, at p. 5, ¶ 11. Among the various findings and conclusions of law by the HRO which McKinney claims were erroneous, McKinney contested the HRO's findings that the School District was not required to develop a comprehensive system of personnel development under the IDEA, and that the paraprofessionals were properly trained. Id. at pp. 5-6, ¶ 11.

Finally, in May of 2002, the School District requested a third due process hearing, MDCFL Case No. 487, for the purposes of implementing an IEP for McKinney.[2] On October 9, 2002, the IHO found that the proposed IEP was appropriate and McKinney appealed this decision to the HRO, which affirmed the IHO's ruling. With respect to MDCFL Case No. 487, the single issue presented to the IHO and HRO was

---

[2]     This Court's recommendation regarding MDCFL Case No. 487 is found in a separate Report and Recommendation issued contemporaneously with this Report and Recommendation.

whether the proposed IEP for the year 2002 should be approved and implemented for McKinney.[3] See First Amended Complaint, at pp. 6-7, ¶ 15.

### B.   MDCFL Case No. 390

#### 1.   Factual Background of MDCFL Case No. 390

On September 14, 1999, the School District sent McKinney's mother a Notice of Team Meeting scheduled for September 22, 1999 in order to develop an annual IEP for McKinney.   See MDCFL Case No. 390 School District Ex. 8.   McKinney's mother, Tammy Emery ("Emery"), was unable to attend the meeting on this date, so the IEP

---

[3]      In McKinney's motion, he has moved for judgment on the record in MDCFL Case Nos. 390, 424 and 487.   In addition, he takes the position that this Court must look at MDCFL Case Nos. 390, 424 and 487 as a whole and not as stand-alone determinations.   See Plaintiff's Memorandum in Response to Defendant's Motion for Judgment on the Administrative Record/Summary Judgment ("Pl.'s Opp. Mem.") at p. 16; see also Plaintiff's Memorandum in Support of Judgment in Favor of the Plaintiff on an Expanded Record or to Set Matter for Trial ("Pl.'s Mem.") at pp. 18-20. McKinney's attempt to move on MDCFL Case No. 487 within the context of the instant motion is rejected.   Not only has the time to bring a dispositive motion on MDCFL Case No. 487 long since passed (see January 29, 2003 Pretrial Scheduling Order [Docket No. 7], setting deadline for dispositive motions in MDCFL Case No. 487 for October 1, 2003), but the current scheduling order governing this case dated November 16, 2004, explicitly limited any dispositive motions to MDCFL Case Nos. 390 and 424 [Docket No. 87].   Additionally, this Court finds no merit to McKinney's assertion that MDCFL Case Nos. 390, 424 and 487 must be reviewed in conjunction with each other.   Not only does this Court consider this argument to be a veiled attempt to get a dispositive motion on Case No. 487 before this Court through the back door, but more importantly, McKinney provides no authority for this assertion.   While an aggrieved party may seek review of an administrative panel's decision by bringing a civil case in federal court, there is nothing to suggest that a court must conclude that the actions of a school district at issue in one due process hearing can be used as evidence regarding claims at issue in a separate due process hearing or that all due process decisions must be examined together as whole.   This is particularly true when the IHO and HRO in each of the three underlying proceedings did not have the opportunity to consider the affect of other proceedings on the particular matter before them.   That is not to say, however, that this Court will not look at evidence submitted as to MDCFL Case No. 424 to determine whether actions by the independent hearing officer impeded McKinney's mother from participating in MDCFL Case No. 487.

meeting was rescheduled for September 29, 1999.  Id.  Emery attended the September 29, 1999 IEP meeting along with her advocate Jan Grieser ("Grieser").  Tr. 184, 1271.

During the IEP meeting, Emery went through her son's previous IEP and outlined to the staff members present what changes she wanted made or items she wanted to be taken out.  Tr. 841, 1142.  She came prepared to ask questions and was able to ask a number of them.  Tr. 841, 1371.  During the meeting, the IEP team members wrote down the goals and objectives, as Emery wanted documentation.  Tr. 1140.  When the IEP team went through each goal and objective, Emery stated whether she thought it was good or whether there were additional items she wanted worked on.  Tr. 185, 1370.  It was Emery's testimony that the IEP team was going through each area of the IEP with "almost a fine tooth comb."  Tr. 1125.

When the IEP team got to the issue of behavior, Emery noted her concern that her son's behavior was connected to his inability to communicate with school staff.  Tr. 1124.  Although the issue of augmentative communication was discussed, Emery did not explicitly request an assistive technology assessment on September 29, 1999.  Tr. 187, 288, 842, 875, 989, 1284-85, 1349.  At the hearing before the IHO, Emery testified that she did not request an assistive technology assessment on September 29, 1999, however, she stated that it was her belief that because they were discussing the use of assistive technology devices, she expected that the rest of the IEP team would infer that she was asking for an assessment.  Tr. 1284-85, 1326-27.

At the end of the of the 3-hour IEP meeting on September 29, 1999, Emery testified that Judy Trepanier ("Trepanier"), McKinney's case manager, yelled at her when Emery asked that one-on-one paraprofessional support be written into her son's

IEP, based on the recommendation of the School District's behavior analyst. Tr. 1127-28.  Specifically, Emery stated that Trepanier responded to the request by slamming her hands down on the table and yelling, "what do you want from me?"  Tr. 1127-28, 1351.  After Emery reiterated her request, Trepanier allegedly said that the School District could not do that, and also told Emery, "you listen to me," and then proceeded to tell Emery that she had two brothers with mental handicaps, that there was no one to help them, and that she was frustrated by unappreciative parents.   Tr. 1128, 1351.  According to Emery, Trepanier then stormed out of the meeting.  Tr. 1128.  Emery's advocate also confirmed at the hearing the claims by Emery, except that she made no mention of Trepanier storming out of the room.  Tr. 1351.  Trepanier denied yelling at Emery during the IEP meeting.  Tr. 187.  According to Trepanier, she told Emery that she did not understand what Emery was requesting, to which Emery responded by telling Trepanier that she did not understand how she had to fight for her son.  Tr. 289.  Trepanier claimed that she attempted to respond empathetically by telling Emery that she did understand what she was going through because of her two brothers and that no paraprofessionals were available back then.  Tr. 291.  Trepanier also testified that she told Emery that it is the policy of the School District not to write in one-on-one paraprofessional support in order to avoid paraprofessional dependency.  Tr. 292.  Trepanier denied being negative towards Emery or storming out of the room.  Tr. 291-92.

Trepanier mailed a proposed IEP dated October 4, 1999, to Emery.  See MDCFL Case No. 390 Student Ex. C; MDCFL Case No. 390 School District Ex. 11, Tr. 1137-38.  Emery objected to the proposed IEP.   See MDCFL Case No. 390  Student Ex. C.

Trepanier telephoned Emery to ask her why she had objected to the proposed IEP.  Tr.
1135.  According to Emery, she told Trepanier that she did not appreciate the way she
had been spoken to at the September 29, 1999 meeting, to which Trepanier allegedly
responded that she felt as if it was something Emery needed to hear.  Tr. 1135.  The
IHO ultimately found that Emery's objections to the IEP were resolved in a conciliation
conference and that they were not the subject the MDCFL Case No. 390 hearing.  See
Wilson Aff., Ex. 1, Findings of Fact ("FF") 23.

On October 22, 1999, Emery asked that the MDCFL investigate her allegations
that she was not treated as an equal participant in the IEP process based on the alleged
altercation she had with Trepanier during the September 29, 1999 IEP meeting, and on
the implementation of new schedules without her consent.[4]  See MDCFL Case No. 390
Student Exs. J, K, Tr. 1145-47.  On November 10, 1999, MDCFL responded to Emery's
claims by finding that her complaints of unequal participation did not constitute a
violation of the IDEA.  See MDCFL Case No. 390 Student Ex. L.  MDCFL found that the
Act requires parents to have an opportunity to participate in the IEP process, but does
not mandate equal participation.  Id.

On December 14, 1999, the parties participated in a conciliation conference in
which Emery made a request for an augmentative communication/assistive technology
evaluation, to which the School District agreed.  See Wilson Aff., Ex. 1, FF 31, Tr. 1149.
Emery received a memorandum of understanding after the conciliation conference on
January 8, 2000.  Tr. 1150.  Emery received no further information regarding an

---

[4]     The implementation of the IEP was also resolved in conciliation.  See Wilson Aff.,
Ex. 1, FF 25.  However, Emery testified that this action by the School District reinforced
her belief that her opinion did not matter.  Tr. 1145-46.

augmentative communication evaluation until February 2000.  Tr. 1150.  However, on January 21, 2000, a speech pathologist from McKinney's school telephoned Ellen Surbrook ("Surbrook"), a district representative for the augmentative communication technology team ("ACT Team"), regarding McKinney.  Tr. 597, 602.  On January 26, 2000, Surbrook was appointed to be McKinney's representative on the ACT Team.  See MDCFL Case No. 390 School District Ex. 16.  Surbrook then prepared a plan for the evaluation of McKinney's assistive technology needs, which included Surbrook observing McKinney.  See MDCFL Case No. 390 School District Ex. 16; Tr. 602-03. However, Surbrook testified that she was not able to observe McKinney because the speech pathologist from McKinney's school, David Satterlund ("Satterlund"), told her on February 9, 2000, that permission to assess McKinney had not yet been given by Emery.[5]  Tr. 603-04.  In this regard, the day before, on February 8**,** the School District, Emery, her legal counsel, and McKinney's private occupational therapist participated in a conference.[6]  Tr. 1172.  Emery testified that the February 8 meeting dealt at least in part with the assistive technology evaluation.  Tr. 1287.  In addition, she stated that she did not give written permission for the assistive technology assessment at this time because she was waiting for credentials of the evaluators.  Tr. 1287-88.  Emery stated that she did not receive the list of credentials until March of 2000.  Tr. 1288.

---

[5]     Surbrook testified that she did not confirm that any notice of evaluation had been sent to Emery, and that she understood that permission had yet to be given to perform the assessment because Emery's counsel wanted to first see her credentials to do the assistive technology portion of the assessment.  Tr. 603-04.

[6]     McKinney's private occupational therapist testified that she was permitted to say anything that was relevant to the meeting.  Tr. 1172.

Cherie Peterson ("Peterson"), a special education consultant for the School District, spoke to Emery over the telephone sometime in February of 2000 about the fact that her son was coming due for his three-year re-evaluation of all areas of concern, including assistive technology.  Tr. 25-26.  According to Peterson, the issue of assistive technology was not something that could be determined in isolation, and that all the areas including academics, communications and functional living implicate assistive technology.  Tr. 28.  Peterson testified that Emery agreed to the three-year evaluation. Tr. 29.  In addition, on February 22, 2000, Peterson wrote a letter to Emery notifying her that the MDCFL was expecting to release a manual in April or May with the recommended process for determining the needs for augmentative communication, which used the format described in an article provide by Emery's counsel at the conciliation conference.  See MDCFL Case No. 390 School District Ex. 22; Tr. 30-31.  In this letter, Peterson asked Emery to fill out a form enclosed with the letter called "Student, Environment, and Tasks Worksheet" prior to the next meeting to assist in determining what areas needed to be assessed.  Id.  However, Emery testified that she did not receive the letter or form.  Tr. 1152.

On February 29, 2000, a meeting was held that was attended by Emery and her advocate.  Tr. 209.  During the meeting, Emery was given a copy of the full evaluation that the School District wanted to perform on McKinney, which included a column for assistive technology and only stated the name of Sattertlund and the ACT Team.  Tr. 1177.  No other discussion regarding assistive technology occurred during the meeting. Tr. 1179.

On March 9, 2000, Trepanier wrote to Emery asking if she wanted to proceed with the evaluation of McKinney so that the School District could send out the final materials to obtain her permission.  See MDCFL Case No. 390 School District Ex. 7, 149; Tr. 1289.  On March 14, 2000, Emery was provided with the request for permission for the evaluation.  See MDCFL Case No. 390 School District Ex. 7, 153; Ex. 63.  Emery signed the permission request for the  evaluation and it was received by the School District on March 21, 2000.  Tr. 1289-90; see also MDCFL Case No. 390 School District Ex. 63.  The assistive technology portion of the evaluation notice stated that the SETT process would be used to gather information in all areas that could be impacted by assistive technology.[7]  Id.  The evaluators listed on the notice were Satterlund and the ACT Team.

On April 12, 2000, Surbrook prepared a second evaluation plan, which was same as her initial evaluation plan,  except that it excluded portions of the plan that had already been completed.  See MDCFL Case No. 390  School District Exs. 16, 29; Tr. 604-605.  It was complied by Surbrook to outline the steps she wanted to take with regards to the assistive technology evaluation.  Tr. 604.  These steps included observing McKinney in the school setting, interviewing staff regarding  his present communication system, collecting assessment forms from staff, discussing observations, drafting a report including suggestions and recommendations regarding communication, meeting with the IEP team to discuss recommendations, and

---

[7]     The SETT process looks at the strengths, weaknesses, a student's environment, and what they are able to accomplish in those environments to determine what tools would assist them.   Tr. 32-33.  It is a process used widely throughout the United States.  Tr. 33.

implementing agreed-upon recommendations. <u>See</u> MDCFL Case No. 390 School District Ex. 29. Emery testified that she did not receive a copy of the April 12, 2000 plan. Tr. 1183.

The actual evaluation conducted by the School District of McKinney relating to assistive technology included:

- Satterlund completed an Augmentative Communication Intake Questionnaire requested by the ACT Team. His responses were based on his knowledge of McKinney, information from McKinney's file, conversations with Emery and staff who worked with McKinney. Tr. 607-08, 853-54; MDCFL Case No. 390 School District Ex. 54. This information was used by Surbrook as background on McKinney, since she did not know him. Tr. 607-08.

- School District staff filled out a SETT worksheet dealing with McKinney's strengths/weaknesses, and his environment. MDCFL Case No. 390 School District Ex. 23.

- McKinney was observed on April 20, 27, and 28 by members of the ACT Team in the morning, afternoon, and while he was in mainstream classes and in special education settings. <u>See</u> MDCFL Case No. 390 School District Ex. 40; Tr. 611, 663. Surbrook testified that she observed McKinney on two separate days for a total of approximately 5-6 hours. Tr. 663. ACT Team members observed McKinney using assistive technology including PECS, Typewrite, computer programs and touch point problem cards. <u>See</u> MDCFL Case No. 390 School District Ex. 33; Tr. 667. Surbrook focused her observations on McKinney's usage of his vocabulary and whether it met his needs in the school setting. Tr. 673-74.

On April 14, 2000, the School District sent Emery a Notice of Team Meeting, which invited her to participate in a May 4, 2000 meeting. <u>See</u> MDCFL Case No. 390 School District Ex. 64. On April 18, 2000, Emery notified the School District that this date did not work, as her attorney was not available, and that she would contact the School District with new dates. <u>Id.</u>, Ex. 35. On the same day Trepanier wrote to Emery agreeing to change the meeting date. She also stated that the "30-day" time limit was

May 9, 2000,[8] and Emery wanted to go beyond that date, she would be doing so knowing it was past the time limit. Id., Ex. 34.

The ACT Team met in the first week in May 2000 to discuss their observations and generate recommendations to the IEP team regarding maintaining or improving McKinney's present communication system. Tr. 614. The ACT Team generated a report dated May 15, 2000, summarizing McKinney's present communication level and observations made during their evaluation of him, and making certain recommendations. See MDCFL Case No. 390 School District Ex. 33; Tr. 613-619. These recommendations included (1) continued use of visual presentation of symbol schedule; (2) continued use of symbol system for backup; (3) continued use of waiting time for allowing McKinney respond to what is being said to him; (4) continued use of safety signals that are used to help the individual continue the activity until the end; and (5) the use of the carrier phrase "tell me" or "tell me all the words." Id. The ACT Team did not recommend use of any augmentative technology. According to Surbrook, it was the ACT Team's opinion that McKinney was "functionally communicating his wants and needs in a variety of settings. As a completely unfamiliar listener to Matt's verbalizations, he was clear and audible 88 percent of the time." Tr. 618.

On the same day as the report was issued by the ACT Team, a meeting was held that included, among others, the IEP team, a speech clinician, a member of the ACT Team, Emery, her advocate and legal counsel. Tr. 1191, 1199; see also MDCFL Case No. 390 Student Ex. Q. Emery and her legal counsel participated in the meeting

---

[8]    This Court notes that the Evaluation notice provided that the evaluation needed to be completed by May 12, 2000. See MDCFL Case No. 390 School District Ex. 63.

by asking questions and making comments, and Emery was also asked questions from staff members present.  Tr. 222-23, 1272-73.  Surbrook testified that she stated at the meeting that it was her belief that McKinney could communicate his wants and needs verbally.  Tr. 620.  Surbrook stated that the ACT Team based its opinion on the observations of McKinney.  Id.

Although the ACT Team did not recommend that augmentative technology be used, based on Emery's request, the IEP team agreed to try different augmentative communication devices on McKinney.  See MDCFL Case No. 390 School District Ex. 40, pp. 5, 12; Tr. 623, 869-70.

Consequently, upon Emery's request, she, her advocate, Surbrook, and Sutterlund met on May 17, 2000 to discuss a plan for trying a variety of devices with McKinney and to figure out a timeline for their use.  Tr. 60-61, 623-24, 856.  During this meeting, the parties also discussed the fact that McKinney was going to spending some of the summer going to class in the School District and was also going to go to summer school in Las Vegas.  Tr. 624.  In this meeting, it was discussed that the Techspeak device would be used during the summer while McKinney was in the School District.  Tr. 625-26.[9]  It was also explained in the May 30, 2000 Notice of Special Education Services that the Minnesota guidelines set forth an extended trial period to determine the effect of an augmentative device in different environments.  See MDCFL Case No.

---

[9]     Satterlund had already worked with McKinney on the Techspeak device in early May of 2000.  Tr. 858, 865.  It was recommended that the Techspeak device continued to be used with McKinney during the summer as he had already been introduced to the device and it was believed that introduction of a new device might not give accurate data since he would be changing locations and school settings in the summer.  Tr. 626. It was also chosen because it is easy to operate.  Tr. 857.

390 School District Ex. 46.  Thus, it was suggested that the analysis of McKinney's use of the Techspeak device be continued until the first part of the school year.  Tr. 626, 857.  After this trial period, a second device called a DynaMyte would be tried by McKinney, a device that Emery was interested in using.  Id.

During the meeting, Surbrook filled out a summary sheet from the SETT manual titled, "Planning and Implementation Summary, Assistive Technology Consideration Process."  See MDCFL Case No. 390 School District Ex. 42.  The summary sheet laid out what devices were to be used, what IEP goals these devices would support, how success would be determined, what level of achievement was expected, what training would be needed, and who would be responsible for the implementation of the consideration process in different environments.  Id.  It was also agreed that McKinney could take the Techspeak device with him to Las Vegas.  See MDCFL Case No. 390 School District Ex. 46.

Subsequently, Surbrook trained a School District speech therapist, who was going to be providing ESY services to McKinney in the summer of 2000, in the use of the Techspeak device.  Tr. 624-25.

On June 29, 2000, Emery made a request  for a due process hearing.  See MDCFL Case No. 390 School District Ex. 49.

### 2.    Hearing Before the Independent Hearing Officer in MDCFL Case No. 390

A due process hearing was held before IHO, Sara Jay, based on the Emery's request.  The issues presented to the IHO were (1) was the School District's assistive technology evaluation done in a timely fashion; (2) was the School District's assistive technology evaluation appropriate; (3) did McKinney receive appropriate modifications

and accommodations in the regular education setting; and (4) was the McKinney's parent, Emery, denied equal participation the IEP process.   See Wilson Aff., Ex. 1. McKinney also challenged the appropriateness of the ESY services offered to McKinney for the summer of 2000 while he was in Las Vegas, Nevada school district.   Id. at FF113; Tr. 10; MDCFL Case No. 390 School District Ex. 49.   The IHO dismissed this claim on August 20, 2000, on the grounds that it was not up to the School District to ensure the appropriateness of ESY services delivered to McKinney outside of the district.   Id.

On the issue of the timeliness of the assistive technology evaluation, the IHO found that Emery made her first request for an augmentative technology assessment evaluation on December 14, 1999 and that the School District failed to make the assessment until May 2000, which was beyond the 30-days allowed for under Minnesota Rules.   Id., Conclusions, ¶¶ 5-9.   The IHO further found that in order to have extended the time limit required by the Minnesota Rules, the School District should have included the time extension as a part of McKinney's IEP, which was not done so until May 2000.   Id., ¶ 9.   The IHO also found that the process for evaluating McKinney's need for assistive technologies conducted by the School District was appropriate as it followed that SETT process, procedures that are widely accepted.   Id., ¶¶ 12.   However, the IHO determined that the assessment could have been more comprehensive, considering McKinney's behavioral concerns.   Id.   Further, the IHO concluded that McKinney was offered a FAPE by the School District and that any delay in the assessment and omissions from the assessment content were overcome by the provision of assistive technology with appropriate trials by the IEP team.   Id., ¶ 14.

In addition, the IHO found that McKinney made progress in increasing his vocabulary and communication despite lack of use of a Picture Exchange Communication System ("PECS")[10] and that he was not deprived of a free and appropriate education ("FAPE").  Id., ¶ 19.

Lastly, the IHO held that Emery was extended offers to participate and did participate in the planning of her son's education and that the outburst by Trepanier was not a violation of the IDEA as it did not hamper Emery's participation in the process.  Id., ¶¶ 20-21.

### 3.    Appeal Before the Hearing Review Officer

On October 25, 2000, McKinney's counsel filed a Notice of Appeal of the IHO's decision with the MDCFL.  See Wilson Aff., Ex. 2.  McKinney raised the following issues in his appeal:

1.  Whether the District provided the Student with a free and appropriate education (FAPE).

2.  Whether the District's assistive technology evaluation was done in a timely fashion.

3.  Whether the District's assistive technology evaluation was appropriate.

4.  Whether the student received appropriate modifications and accommodations in the regular education setting.

5.  Whether the Parent was denied equal participation in the IEP process.

---

[10]    PECS is used to assist children in communicating their wants, needs, and what they would like to say. Tr. 1335-36.   The picture schedule portion of the PECS contained visualizations on what was happening during the day, for example, and what was coming up next.  Tr. 1336.  It contains a bank of pictures that allow children to find what they want to communicate and verbalize it to their teacher.  Tr. 1334.

6.     Whether the IHO properly dismissed the issue regarding the appropriateness of ESY services offered by Las Vegas, Nevada School District.

7.     Whether the testimony of Dr. Peggy Locke was properly included.

Id. at p. 2.

The HRO concluded that the IHO properly found that the School District provided McKinney with FAPE considering that the record indicated that he was receiving a meaningful benefit from his educational program.  Id., ¶ 9.  Specifically, the HRO concluded that the record supported the finding that McKinney was beginning to read, was making progress in math and his communication goals, his vocabulary was increasing, he could answer questions with greater accuracy, he could better follow directions, and his social interactions improved.  Id.  According to the HRO, failure to fully implement PECS did not deprive McKinney of a FAPE.  Id.

The HRO also found that the School District was not obligated to evaluate or provide McKinney with augmentative devices, given that the School District was providing him with FAPE.  Id., ¶19.  The HRO did find that the development of the assessment was unduly delayed, but that there was insufficient evidence that McKinney was denied FAPE because of this.  Id.  According to the HRO, School District's evaluation was timely since it received permission to conduct the assessment on March 21, 2000, the evaluation was completed in early May, and the device trials were incorporated into the IEP on May 30, 2000.[11]  Id., ¶ 20.

_____

[11]     Although the IEP team was not included in the ACT Team's assessment for augmentative communication devices, the HRO noted that a member of the IEP team and Emery submitted data and observations to the ACT Team.  Id., ¶ 24.  The HRO also found the IEP team, in large part due to the input of Emery, went against the

The HRO also determined that the record indicated that the School District implemented modifications and accommodations provided for in McKinney's IEP and that its failure to extensively use PECS could not be seen as depriving McKinney of a educational benefit since he had made progress in the areas of vocabulary and communication regardless. Id., ¶ 28.

Additionally, the HRO found that the IHO findings were correct as it related to the participation of Emery in the planning of her son's education, as she was able to participate in meetings and provided significant input. Id., ¶ 33. The HRO determined that there was no requirement that Emery be involved in the design and evaluation of McKinney's need for augmentative communication, that she was provided information for the evaluation, and that she was involved in the meeting to discuss the results of the evaluation. Id., ¶ 32.

Finally, the HRO decided that the IHO correctly dismissed McKinney's claim for ESY services in Las Vegas, and that the IHO did not error by admitting at the hearing the testimony of Dr. Peggy Locke, the School District's expert witness. Id., ¶¶ 35-43.

### C.   MDCFL CASE NO. 424

#### 1.   Factual Background of MDCFL Case No. 424

McKinney was using a DynaMyte device during the 2000-01 school year as an augmentative communication device. Tr. 30. In addition, the IEP for McKinney's 2000-01 school year required that he receive one-on-one paraprofessional services. See

---

recommendation of the ACT Team, and therefore, to the extent the evaluation was incomplete or was done independently from the IEP team, McKinney did not lose any educational benefit. Id., ¶ 25.

MDCFL Case No. 424 School District Ex. 2.   Initially, Cheryl Peters ("Peters") was McKinney's paraprofessional.[12]

On March 13, 2001, Ann Nehring ("Nehring"), a special education teacher and reading specialist for the School District, and McKinney's case manager and reading teacher for the 2000-01 school year, informed Emery that Peters had accepted another position and would be leaving Andover Elementary School.   Tr. 22, 31; see also MDCFL Case No. 424 School District Ex. 3.   According to Nehring, she did not believe that the school could find a full-time replacement for Peters for the rest of the year, but she knew she would be able to obtain the assistance of substitutes.   Tr. 32; see also MDCFL Case No. 424 School District Ex. 4.   Based on recommendations, Kim DeVries ("DeVries") and Kathryn Clark ("Clark") were selected to be McKinney's substitute paraprofessionals.[13]   Id.

---

[12]   Although the IEP listed Peters as a paraprofessional, nothing in the IEP required that she be McKinney's paraprofessional for the entire 2000-01 school year.   MDCFL Case No. 424 School District Ex. 2.; Tr. 25.

[13]   DeVries has a certificate in pre-school education and is the mother of children with disabilities.   Tr. 153, 155.   She has been trained by the School District in the areas of behavior modification, promoting independence, and legal issues.   Tr. 156.   DeVries had previously worked as a paraprofessional for the School District.   Tr. 154-55.   Clark received a Bachelors of Science degree in communication disorders and a Masters degree in counselor education.   Tr. 204.   Clark's experience in the School District included working as a specialized paraprofessional who works with children that have multiple handicaps of being blind and deaf, and being a substitute paraprofessional.   Tr. 205.   She also served as private tutor for an autistic boy in the area of academic, speech, and language activities.   Tr. 205-06.   In addition, she served as a speech clinician in two North Carolina school districts.   Tr. 205-06.

Prior to beginning working with McKinney, the plan was for Sutterlund[14] to train the substitute paraprofessionals in the use of DynaMyte with McKinney and for them to spend time with Peters to go through McKinney's day-to-day activities.  Tr. 32, 88-91. McKinney's IEP also provided that the School District would "attempt to enroll Mathew's paraprofessional in training done by DynaVox.   Enrollment depends on class availability."  See MDCFL Case No. 424 School District E x. 2 at p. 12; Tr. 87.

On March 20, 2001, Emery requested an IEP meeting regarding the change in her son's paraprofessional.  See MDCFL Case No. 424 School District Ex. 3; Tr. 32-33. The School District arranged for an IEP meeting on March 28, 2001 to discuss the transition plan for McKinney's paraprofessionals.  Tr. 33.  However, Emery stated that she could not attend the IEP meeting that day because the School District had not provided her with some information that she had requested regarding Peter's training and background, as well of that of the two new paraprofessionals.  Tr. 33, 336. According to Nehring, Emery had never requested this information.  Tr. 33.

---

[14]      Sutterlund has attended training courses sponsored by the makers of the DynaMyte.  Tr. 129.  Prior to the 2000-2001 school year, Sutterlund had assisted at least two students in the use of the DynaVox.  Tr. 129.  DynaVox is the larger version of the DynaMyte.  Tr. 128.  He was the person responsible on McKinney's IEP team for programming the DynaMyte.  Tr. 130.  Sutterlund also attended the in-house training in December of 2000 on how to program buttons to have symbols or words on them, and how to set a page.   Tr. 131.  He had also spoken with a representative of the DynaVox Company on how to use DynaVox software on a computer and transfer it to the device. Tr. 131.  Sutterlund also attended two additional workshops on the use of the DynaVox. Tr. 132.  Emery testified that she was concerned about Sutterlund's capability with the DynaMyte because some of the buttons on the device he programmed did not link to anything, and because he could not make the keyboard match that of another device McKinney had been using.  Tr.  267-68.  However, Emery testified that she only had a few problems and that the problems were addressed by contacting the DynaVox representative.  Emery also testified that Sutterlund's training was not an issue in this case. Tr. 267-69, 339-340.

On March 23, 2001, Emery sent a letter to the School District asking that the two new substitute paraprofessionals each be given two days of training with Peters and that they attend DynaMyte training with DynaVox.  See MDCFL Case No. 424 School District Ex. 4.  Emery also asked for a due process hearing subject to a conciliation conference.  Id.  Peterson, Assistant Director of Special Education, wrote a letter to Emery, dated March 23, 2001, that the new substitute paraprofessional would each be given two days of training with Peters and that the School District would see about sending them to the April 9, 2000 DynaVox training session.  See MDCFL Case No. 424 School District Ex. 5; Tr. 34-35.  On March 27, 2001, Emery sent a letter to the School District referencing the March 23, 2001 letter from Peterson, and stating that her concerns were not resolved and that she wanted a due process hearing.  See MDCFL Case No. 424 School District Ex. 8.

Before beginning to work with McKinney, the two substitute paraprofessionals followed Peters while she working with McKinney for two days.  Tr. 157-58, 207.  Peters also showed them how to add in spelling words on the DynaMyte, where the speech controls were, how to pull up different pages, and complete documentation as required by the IEP.  Tr. 162-63, 207-08.[15]  On March 30, 2001, Sutterlund trained the substitute paraprofessionals in using the DynaMyte, how to do some programming, and how to keep data on the device.  Tr. 136, 161, 209-10.  Subsequently, he encouraged them to use the DynaMyte in responding to questions and in social situations.   Tr. 137.

---

[15]    Emery testified that when she observed DeVries following Peters for part of one day, she did not observe her being trained on the use of the DynaMyte. However, she also testified that she only observed for a half hour.  Tr. 358-59.

However, Sutterlund testified that he did not train the paraprofessionals in some of the more advance classes concerning the DynaMyte's use.  Tr. 145.

The School District also attempted to enroll DeVries and Clark in a DynaVox training seminar for the DynaMyte scheduled for April 9, 2001, however, both individuals were unable to attend due to family conflicts.  Tr. 94.  The next available date for the training was May 18, 2001, and both substitute paraprofessionals attended this session. Tr. 94, 165, 209.

DeVries began her work with McKinney on April 16, 2001 and Clark began working with McKinney the next day.[16]  Tr. 220-21.  DeVries worked with McKinney for 2-3 days a week, while Clark worked with him for the balance of the week.  Tr. 157. Sutterlund testified that he was available anytime during the school day if the substitute paraprofessionals had any questions relating to the use of the DynaMyte and that the paraprofessionals did utilize him in a non-emergency situation when they had some issues with programming the device.    Tr. 141-43.

According to Emery, the main issue in MDCFL Case No. 424 was Goal Number 5 of the IEP, which provides, "Matthew will improve his social skills in the areas of peer interactions and self-control from depending on verbal prompt to an independent level." Tr. 386; see also MDCFL Case No. 424 School District Ex. 2 pp. 6-7.  The objective of Goal Number 5 included: (1) using the DynaMyte, McKinney would increase his independent interactions with peers by three interactions per week; (2) using the DynaMyte, McKinney will tell a peer what he did the night before without prompts 80%

---

[16]    The paraprofessionals did not start working with McKinney until April 16, 2001, because he was absent from April 2-6 and the School District was on spring break from April 9-13.  Tr. 366-67.

of trials; (3) using the DynaMyte, McKinney would say the Pledge of Allegiance without prompts; (4) while McKinney was learning the DynaMyte, his paraprofessional would practice with him at least 2 times a day with a 100% accuracy; and (5) that McKinney would decrease his target behaviors.  See MDCFL Case No. 424 School District Ex. 2 at p. 6.  Sutterlund and Nehring testified that the change in paraprofessional did not affect McKinney's progress in a negative way and that progress was actually made.  Tr. 58-59, 141.  Emery disputed the assertion that the substitute paraprofessionals had a positive outcome on McKinney.  Tr. 301-314.

McKinney's March 26, 2001 IEP progress report for his second trimester for the 2000-01 school year stated that: (1) he averaged 13 interactions (2.6/day) per week with his peers, of which 33% of these were independent; (2) he shared with peers what he had done the night before 3% of the time without any prompts and 33% of the time with prompts; (3) he used his DynaMyte to say the Pledge of Allegiance independently 7% of trials and that he responded with a prompt 42% of trials; (4) he averaged using the DynaMyte 2.5 times a day with 100% accuracy and that 75% of the trials he required no prompt; and (5) he average 2.8 targeted behaviors per day (e.g., bolting, screaming and swearing).  See MDCFL Case No. 424 School District Ex. 7 at p. 7.

McKinney's IEP progress report for his third trimester for the 2000-01 school year stated that (1) he averaged 13.5 interactions per week (2.7/day) with his peers, of which 31% of these were independent; (2) he shared with peers with what he did the night before 16% of the time without any prompts and 59% of the time with prompts; (3) he used his DynaMyte to say the Pledge of Allegiance independently 9% of trials, he responded with a prompt 43% of trials, and he verbally said the Pledge of allegiance

without the use of the DynaMyte 53% of trials; (4) he averaged using the DynaMyte 3.1 times a day with 100% accuracy and that 63% of the trials he required no prompt; and (5) no mention as made of target behaviors. <u>See</u> MDCFL Case No. 424 School District Ex. 18.

### 2. Hearing Before the Independent Hearing Officer in MDCFL Case No. 424

On June 11-12, 2001, a due process hearing was conducted before Kenneth Ubong Udoibok, the IHO.  While the focus of the hearing was on the training of the substitute paraprofessionals prior to their working with McKinney, McKinney raised several other challenges related to the hearing.  The first challenge related to a comment by the IHO at the hearing in response to Emery's opinion regarding why her son had only made a 2% increase in the recitation of the Pledge of Allegiance without any prompting, Tr. 310.  In this regard, the following exchange occurred during Emery's testimony:

> Q:    Okay.  Now Matthew's performance during second trimester is that he gained seven percent and during trimester three he went from seven percent  to nine percent. Do you have an opinion about what Matthew's performance was?
>
> A.    That he had an increase of two percent.
>
> Q.    And do you have an opinion as to why?
>
> MS. MACE: Objection.  Foundation.
>
> MS. KERR:  She can offer an opinion.
>
> THE HEARING OFFICER:  Overruled.  Just so you know, its an opinion of a mother.
>
> MS. KERR:  It's the opinion of a mother who has been to a lot of training and more training than the paras.

> THE HEARING OFFICER:   Right.   The student --
> Among other needs that the student has is not just DynaVox.
> Many things could cause  -- bring that number over and
> above the use of the DynaVox.  It could be a neurological.  It
> can be a teacher.  It could be environment.  We haven't
> established that.
>
> MS. KERR:  We haven't established that he made the
> same progress in the third tri as he did the second tri and
> that's what we're attempting to show.
>
> MS. MACE:  I'm not sure there's a standard that you
> have to make the exact same progress in the third trimester
> and he did in the second trimester.
>
> THE HEARING OFFICER:   Just let her give the
> testimony.
>
> * * *
>
> THE WITNESS:  In my opinion, it's because  -- I'm sure it's
> because -- it has a lot to do with training and the change of
> paras.

Tr. 310; see also Pl.'s Opp. Mem. at p. 24 (citing Tr. 310).

The second challenge related to the School District's objection to McKinney's

offer of Exhibits 4 and 5 into evidence.   Tr. 413, 418.   Exhibit No. 4 is the Master

Agreement between the School District and the Anoka-Hennepin Paraprofessional

Association.   See MDCFL Case No. 424 Student Ex. 4.   Exhibit 5 dealt with the

necessary position standards for paraprofessionals in the School District.  See MDCFL

Case No. 424 Student Ex. 5.  The IHO reserved his decision on the documents pending

a post-hearing submission from McKinney's counsel.  Tr. 415, 419.  Ultimately, The IHO

made no finding as to the exclusion of Exhibits 4 and 5 in his decision.

The third challenge related to the IHO's decision to sequester McKinney's

advocate prior to her testifying at the hearing.  Tr. 5-12.

In his decision, the IHO found that the School District's change of paraprofessionals was not in violation of the IEP because the change was not a modification of the IEP and because the evidence in the record indicated that McKinney made progress despite the change in staff.  See Wilson Aff., Ex. 3 at p. 7.  In addition, the IHO concluded that School District did not violate the training requirements set forth by Minn. Stat. § 125A.08(b).  Id. at pp. 8-9.  Further, the IHO found that McKinney had not plead any claim that he was denied FAPE because the substitute paraprofessionals lacked knowledge regarding emergency procedures, building orientation, confidentiality, vulnerability, or reportability.  Id. at p. 9.

### 3.    Appeal before the Hearing Review Officer

On August 20, 2001, McKinney's counsel filed a Notice of Appeal of the IHO's decision with the MDCFL.  See Wilson Aff., Ex. 4.  McKinney raised the following issues in his appeal in conjunction with MDCFL Case No. 424:

1.    Whether the IHO erred in finding that, as of the date of the hearing request, the Andover paraprofessionals were trained; whether the IHO ignored the language of Minn. Stat. § 125A.08(b) regarding paraprofessional training; and whether Minn. Stat. § 125A.08(b) violates the IDEA's requirement of sufficient staff training found in 20 U.S.C. § 1453(c)(3).

2.    Whether the District is required to develop a comprehensive system of personal development as referred to in the IDEA.

3.    Whether the IHO erred in failing to order training of the paraprofessionals.

4.    Whether the IHO erred in finding that a change in personnel is within the discretion of the District and not subject to discussion by the IEP team.

5. Whether the IHO erred in sequestering the ARC representative who was also listed as a witness.

6. Whether the IHO erred in failing to determine if Student's Exhibits 4 and 5 should be excluded from evidence.

7. Whether the IHO failed to give Parent's testimony the proper weight.

8. Whether certain findings of fact are supported by the record.

Id. at p. 2.

The HRO concluded that the findings of fact by the IHO were correct save for the IHO's finding that the IEP required that Peters be McKinney's paraprofessional for the entire 2000-01 school year.   Id., pp. 2-3; p. 6, ¶ 21.   The HRO found that the IHO correctly determined that the substitute paraprofessionals were adequately trained and also received additional training in compliance with the language of Minn. Stat. § 125A.08(b).   Id. at pp. 4-5, ¶¶ 11-12.   Further, the HRO found that the IDEA does not require a school district to develop an Comprehensive System of Personal Development.   Id. at p. 5, ¶ 14.   It was also the HRO's opinion that School District has the discretion as to who will provide students services without parental input, and that regardless, the School District attempted to have an IEP meeting to address the issue, but the parent did not attend.   Id. at p. 5, ¶¶ 16-17.   Although the HRO found that the IHO erred in failing to determine whether Student Exhibit Nos. 4-5 should be excluded, the HRO concluded that the exhibits were irrelevant to the issues in the case and were properly excluded. Id. at p. 3; p. 6, ¶ 19.    Lastly, the HRO concluded that the IHO did not ignore Emery's testimony on training issues relating to the DynaMyte, as there was no evidence in the record that her testimony was not weighed appropriately.   Id. at p. 6,

¶ 20.

## II.   **DISCUSSION**

### A.   **Standard of Review**

The IDEA allows aggrieved individuals to seek review of an administrative hearing body's decision by bringing an action in federal district court.  See 20 U.S.C. § 1415(i)(2)(A).  However, judges are not trained educators and therefore, judicial review under the IDEA is limited.  E.S. v. Independent Sch. Dist., No. 196, 135 F.3d 566, 569 (8th Cir. 1998).  "A Motion for Judgment on the Record, in the context of the IDEA, is a request that the Court enter a final Judgment in what is essentially 'a bench trial on a stipulated record.'"  Slama v. Independent Sch. Dist. No. 2580, 259 F. Supp.2d 880, 882 (D. Minn. 2003) (quoting Ojai Unified Sch. Dist. v. Jackson, 4 F.3d 1467, 1472 (9th Cir. 1993), cert. denied, 513 U.S. 825 (1994)).  It is the reviewing court's duty under the IDEA to determine based upon the "preponderance of the evidence," whether a school district has complied with the Act.  See Slama, 259 F. Supp.2d at 882 (citing S.D., 88 F.3d at 561) (citations omitted); see also CJN v. Minneapolis Public Schools, 323 F.3d 630, 633 (8th Cir, 2003) ("Under the IDEA, a district court must review the state administrative record, hear additional evidence if requested, and, 'basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate.'") (quoting 20 U.S.C. § 1415(i)(2)(B)).  A review of an agency's action may be conducted on the administrative record even if there are disputed issues of material fact.  See Independent Sch. Dist. No. 283 v. S.D., 88 F.3d 556, 561 (8th Cir. 1996).

The United States Supreme Court has "emphasized that the district court must afford the administrative proceedings 'due weight.'"  Blackmon v. Springfield R-XII

School District, 198 F.3d 648, 655 (8th Cir. 1999) (citing Hendrick Hudson Dist. Bd. of Educ. v. Rowley, 458 U.S. 176, 206 (1982)).  "The district court's standard of review is less deferential than that applied under the substantial evidence test that courts ordinarily apply in federal administrative law cases, however, a district court must give consideration 'to the fact that the state hearing panel has had the opportunity to observe the demeanor of the witnesses.'"  Id. at 654-55 (quoting Fort Zumwalt Sch. Dist. v. Clynes, 119 F.3d 607, 610 (8th Cir. 1997), cert. denied, 523 U.S. 1137 (1998)).  Where an IEP is being challenged, a court may not substitute its "'notions of sound educational policy for those of the school authorities.'"  Id. (quoting Petersen v. Hastings Public Schools, 31 F.3d 705, 707 (8th Cir. 1994), quoting Rowley, 458 U.S. at 206); see also Slama, 259 F. Supp.2d at 882 (citations omitted).  The reason for this deference is because courts do not have the specialized knowledge and experience required to resolve difficult questing regarding policy.  See Blackmon, 198 F.3d at 655 (citing Rowley, 458 U.S. at 208) (citation omitted).

### B.    MDCFL Case No. 390

According to McKinney, the HRO held that:

> 1) [T]he administrative hearing process lacked authority to determine the issue of a parent's equal participation in the IEP meetings; 2) that although the ISD 11 had delayed an assistive technology evaluation and thus, ultimately, an assistive technology device, Plaintiff Matthew was not entitled to any relief because he "eventually" received an augmentative communication device; 3) staff were not trained in PECS but plaintiff Matthew was not entitled to any relief; 4) that the administrative hearing officers lacked any authority to ensure Plaintiff Matthew received ESYS; and 5) that Plaintiff had received accommodations and modifications in the regular education class room.

See First Amended Complaint, at p. 4, ¶ 9.  McKinney appealed the decision of the

HRO in all respects.  Id.

The parties have now filed cross-motions for judgment on the administrative record.

In conjunction with its motion for judgment on the record on MDCFL Case No, 390, the School District argued the following:

- The School District provided McKinney with FAPE.

- The School District's assistive technology evaluation was timely and appropriate.

- McKinney received appropriate modifications and accommodations in the regular education setting.

- Emery was not denied equal participation in the IEP process.

- The IHO and HRO properly ruled on the dismissal of McKinney's claim for ESY services in Las Vegas, Nevada.

- The IHO and HRO properly ruled on the allowance of expert, Dr. Peggy Locke, to testify at the hearing.

In conjunction with his motion for judgment on the record, McKinney submitted the following issues for consideration:

- The School District did not provide McKinney with FAPE because his parent was denied involvement both procedurally and substantively.

- Emery was denied equal participation in the IEP process, including the trivialization of her input at the due process hearing.

- The School District denied McKinney an ESY.

- The School District denied McKinney assistive technology evaluation, devices and services.

McKinney did not address in his moving papers or in his response to the School District's motion for judgment on the record, the School District's contentions that

McKinney had been provided with FAPE[17], that he had received appropriate modifications and accommodations in the regular education setting, or that Dr. Peggy Locke's testimony was properly received by the IHO at the hearing.  Similarly, McKinney did not address the finding of the HRO that while staff were not trained in PECS, McKinney was not entitled to any relief.  Thus, having failed to present evidence or argument on these claims, this Court concludes that they are abandoned and will not address them.  See e.g., Thomsen v. Ross, 368 F.Supp.2d 961, 974 n. 9 (D. Minn. 2005) (finding that a plaintiff had abandoned claims in his complaint that were not addressed in his summary judgment submissions).

### 1.    Assistive Technology Evaluation

McKinney claims that the record establishes he was denied a timely assistive technology evaluation, devices and services; the School District argued that the timely assistive technology evaluation was timely and appropriate.  See Pl.'s Mem. at pp. 30-31; see also Defendant's Memorandum in Support of Defendant's Motion for Judgment on the Administrative Record/Summary Judgment ("Def.'s Mem.") at pp. 9-13.

The IDEA provides that an IEP team must "[c]onsider whether the child requires assistive technology devices and services." 20 U.S.C. § 1414(d)(3)(B)(v); 34 C.F.R. § 300.346(a)(2)(v).[18]   A school district "is required to evaluate a student's need for

---

[17]    McKinney's argument regarding FAPE was confined to his claims that his mother was not allowed to adequately participate in the assistive technology meetings and that she was mistreated during the IEP meeting.  See Pl.'s Mem. at pp. 20-23.  These are the issues that will be addressed in this Report and Recommendation.

[18]    Assistive technology devices include "any item, piece of equipment, or product system, whether acquired commercially off the self, modified, or customized, that is used to increase, maintain, or improve the functional capabilities of a child with a disability." 34 C.F.R. § 300.5.

assistive technology in situations where the student's particular circumstances indicate such technology might be necessary to obtain FAPE."   Grant v. Independent School District No. 11, No. Civ. 02-795 (ADM/AJB), 2005 WL 1539805 at *12 (D. Minn. June 30, 2005) (string citation omitted).   In addition, an evaluation must be conducted upon parental request and a district may not unduly delay in responding to a request for an evaluation.   34 C.F.R. § 300.356(b); see also School Board of Independent School Dist. No. 11, Anoka-Hennepin v. Pachl ex rel. Pachl, No. Civ. 01-342(SRN), 2002 WL 32653752 at *15 (D. Minn. May 10, 2002).   In addition, the Minnesota Rules required that an assessment requested by a parent be conducted "within a reasonable time not to exceed 30 days from the date the district receives parental permission to conduct the assessment or the expiration of the ten-day parental response time in cases other than initial evaluation, unless a conciliation conference or hearing is requested. . . ."   Minn. R. 3525.2550, Subp. 2(C).   This rule has been clarified to provide that the 30 days are school days and that the parental response time is to be counted as calendar days. See Minn. R. 3525.2550, Subp. 2(C) (2004).

In the October 16, 1998, the proposed October 4, 1999, and revised February 8, 2000 IEPs, the only mention of assistive technologies was that a PECS notebook would be used to help McKinney communicate.   See MDCFL Case No. 390 School District Exs. 4, 11, 19.   No mention was made in the IEPs of any other assistive technologies being used by McKinney.

On December 14, 1999, Emery made a request for an augmentative communication/assistive technology evaluation and the School District agreed to conduct it.[19]  Tr. 1149.

On January 26, 2000, Surbrook was appointed by the School District to be McKinney's representative on the augmentative communication team.  See MDCFL Case No. 390 School District Ex. 16; Tr. 602.  Although there was a discussion between Emery and the School District sometime in February about including the assistive technology assessment with McKinney's three-year evaluation, there is no indication in the record that the School District attempted to solicit Emery's permission to proceed with the evaluation until the February 8, 2000 meeting regarding assistive technology. Tr. 25-26, 29, 1287-88.  At that time, Emery refused to give her permission to proceed with her son's evaluation without first receiving the credentials of the ACT Team.  Tr. 1287-88.  During a February 29, 2000 meeting, Emery was given a list of the full evaluation that the School District wanted to perform on McKinney.  The list included a column for an assistive technology evaluation, but only set out the name of Satterlund and the "ACT Team."  Tr. 1177.  Emery did not receive the list of credentials of the ACT Team until sometime in March of 2000. Tr. 1288.  Moreover, she was not asked again for permission to proceed with her son's evaluation until March 9, 2000, nor did she receive the Notice of Educational Evaluation/Reevaluation Plan and permission sheet until March 14, 2000.  See MDCFL Case No. 390 School District Ex. 7, 149, Ex. 63; Tr. 1289.

---

[19]    Although Emery may have mentioned the use of augmentative communication devices during the IEP meeting on September 29, 1999, she admitted that she never requested assistive technology assessment at that time.  Tr. 1284-85, 1326-27.

In sum, it took over month, from the time Emery made the request for an evaluation, to appoint a representative to the ACT Team and to begin planning for McKinney's evaluation.   Further, the School District did not even attempt to elicit Emery's permission to proceed with the evaluation until  almost two months after her request, and then waited approximately another month to provide her with staff credentials she had been seeking in order to obtain her approval.  It was not until March 14, 2000, three months after her request, that the School District finally sent Emery the written request for permission to proceed with the evaluation.  Thus, the preponderance of the evidence demonstrates that there was an undue delay in obtaining the permission of Emery to proceed with the evaluation of McKinney's assistive technology needs.

However, once permission was given by Emery to proceed with the assistive technology evaluation, the School District did comply with the timing requirements under the Minnesota Rules.  The School District received Emery's permission to proceed with the assistive technology assessment on March 21, 2000.  Therefore, under the Rules, the evaluation had to be completed by May 9, 2000.[20]

Surbrook testified that the observations of McKinney took place on April 20, 27, and 28.  Tr. 611.  The meeting to discuss the findings by the ACT Team occurred in the first week of May.  Tr. 613-14.  The Augmentative Communication Team Report, dated

---

[20]      Thirty school days from March 21, 2000, taking into account that spring break, comes to May 9, 2000.  This Court notes that the School District initially wanted to meet with Emery on May 4 regarding the evaluation, but Emery could not meet on that date because her attorney was not available.  See MDCFL Case No. 390 School District Exs. 34, 35, 64.  Emery was then told by the School District that they would agree to a date change, but that the 30-day time-limit for the evaluation was May 9, 2000, and if Emery wanted to go beyond that date, she would be doing so knowing it was past the time limit.  Id., Ex. 34.  The evaluation meeting took place on May 15, 2000.  Tr. 619.

May 15, 2000 (the same day the evaluation meeting took place), was generated after the observations of McKinney had occurred, data had been gathered and the ACT Team met.   Tr. 613.   Accordingly, this Court finds that the preponderance of the evidence supports the findings of the HRO that the evaluation by the ACT Team was conducted within the time allowed by the Minnesota Rules.

Further, even though there was delay obtaining Emery's permission to proceed with the assessment which resulted in the delay in it taking place, this Court finds that the IHO and the HRO's conclusions that such a delay did not deprive McKinney of FAPE is supported by a preponderance of the evidence in the record given that McKinney was making progress in the area of communication.

Procedural violations of the IDEA are subject to the harmless error standard and such violation is only actionable "when they seriously hamper parent's participation rights, cause a deprivation of educational benefits or otherwise compromise a child's right to a appropriate education."   Pachl v. Seagren, No. Civ. 03-6501, 2005 WL 1459647 at *2 (D. Minn. June 20, 2005) (citing S.D., 88 F.3d at 562).

Sutterlund testified that during the initial September 29, 1999 IEP meeting, the IEP team discussed the issue of augmentative devices and concluded that McKinney was communicating verbally in a competent manner and that no device was required. Tr. 843, 876.   In addition, the proposed IEP generated as a result of the September 29, 1999 meeting stated that Emery "expressed noticing that his vocabulary increased." See MDCFL Case No. 390 School District Ex. 11.   The proposed IEP also stated that McKinney had also been making significant gains in his ability to use functional verbal communication, with an estimated 200-word vocabulary.   Id.   In this regard, McKinney's

verbal vocabulary increased by 85-100 words during the 1999-2000 school year.   Tr. 888-89; Tr. 1094; see also MDCFL Case No. 390 School District Ex. 47.   McKinney's IEP goal had provided that he increase his vocabulary by 20 words per trimester.   See MDCFL Case No. 390 School District Exs. 11, 19.   At the end of the school year he could correctly answer "who" questions 60% of the time and correctly answer "what doing" and "where" questions 60% of the time.   See MDCFL Case No. 390 School District Ex. 14 at p. 12.   He also verbally initiated requests for items and activities in 80% of the opportunities provided to him.   Id.

Sutterlund testified that McKinney saw growth in his ability to communicate, as he was able to communicate about more things, spontaneously come up with new words and comment about things in a manner that he had not seen previously in McKinney.   Tr. 868-69.   In addition, Sutterlund observed that McKinney had increased his social communication with peers and other people in the school.   Tr. 869.   His regular education teacher also stated that McKinney had made an amazing transition during the school year in the area of communication.   In particular, this teacher stated that in the beginning of the year his language was garbled and he had progressed to the point where he could say the Pledge of Allegiance.   Tr. 1012.

Based on the evidence presented, this case is distinguishable from School Board of Independent School District No. 11, Anoka-Hennepin v. Pachl ex rel. Pachl, No. Civ. 01-342 (SRN), 2002 WL 32653752 (D. Minn. May 10, 2002), cited by McKinney, where the delay in an assistive technology evaluation was found by the court to have deprived a student of FAPE.   Id. at *16.   In Pachl, the student made request for an assistive technology evaluation on June 11, 1999, the evaluation was conducted on May 5, 2000

and was concluded on May 26, 2000.  Id. at *2, *5.   In addition, the student had no

ability to communicate at the time of the hearing.   Therefore, it could not be argued by

the school district in that case that it had provided the student with more than a de

minimis educational benefit.  Id. at *15-16.  Here, as stated previously, the delay in this

case was a matter of three months.  More importantly, as demonstrated above, unlike

the student in Pachl, McKinney did receive a meaningful benefit from his educational

program despite the lack of an electronic augmentative device such as the Techspeak

or the DynaMyte.  As such, this Court finds that the HRO did not error in concluding that

McKinney was not deprived of FAPE by the School District's delay. [21]

---

[21]    One of the issues before the HRO was whether the School District's assistive
technology evaluation was appropriate.  See Wilson Aff., Ex. 2 at p. 2.  As McKinney
had asserted in his Amended Complaint that the HRO's decision was in error on all
accounts, the School District argued on its motion that the assistive technology
evaluation was appropriate and did not deny FAPE to McKinney (see Def.'s Mem. at pp.
12-13).  McKinney did not address the appropriateness of the evaluation in any of his
written submissions, only that it was untimely.  Thus, the Court concludes that he has
abandoned this claim.   Nevertheless, the Court finds that the School District's
evaluation of McKinney's need for assistive technology was appropriate and did not
deny him FAPE.

In conducting any evaluation, a school district should abide by the following

guidelines:

> [U]se "a variety of assessment tools and strategies . . . to
> gather relevant functional and developmental information
> about the child, including information provided by the parent,
> . . . [that] [n]o single procedure is used as the sole criterion
> for determining . . . an appropriate educational program for
> the child, [and that] [t]he public agency use[ ] assessment
> tools and strategies that provide relevant information that
> directly assists persons in determining the educational needs
> of the child."

34 C.F.R § 300.532.

The evidence before this Court established that the School District used the SETT process to gather information in all areas that could be impacted by assistive technology, a process used widely throughout the United States and the procedure recommended by MDCFL in accessing the need of assistive devices.  Tr. 33; see also MDCFL Case No. 390 School District Ex. 43, 63.  As part of this process Satterlund completed an Augmentative Communication Intake Questionnaire at the request of the ACT Team based on his knowledge of McKinney, information from McKinney's file, conversations with Emery, and conversations with staff who worked with McKinney.  Tr. 607-08, 853-54; MDCFL Case No. 390 School District Ex. 54.  This information was used by Surbrook as background on McKinney.  Tr. 607-08.  School District staff also filled out a SETT worksheet dealing with McKinney's strengths and weaknesses, his environment.  See MDCFL Case No. 390 School District Ex. 23.  McKinney was then observed using a variety of communication aids on three days by members of the ACT Team in mainstream classes and special education settings.  See MDCFL Case No. 390 School District Exs. 33, 40; Tr. 663, 667.  Surbrook focused her observations on McKinney's usage of his vocabulary and whether it met his needs in the school setting.  Tr. 673-74.  In addition, McKinney's behavior was monitored.  Tr. 462.

Surbrook testified that typically, the ACT Team does not conduct a device evaluation during the initial 30-day period as the initial time period is used to determine whether a device trial is appropriate.  Tr. 621-22.  This is consistent with the MDCFL's guidelines of having the first part of the evaluation deal with determining strengths, needs and environment in which the student needs to complete tasks, and the second portion use extended trials of assistive devices in the student's environment.  See MDCFL Case No. 390 School District Ex. 43.  In any event, the School District did begin using a Techspeak device with McKinney prior to the May 15, 2000 meeting.  Tr. 858, 865.

Finally, the School District's expert, Dr. Peggy Locke, testified that "it is great" if an augmentative communication evaluation can be done at the same time an evaluation of all student's needs are being performed, since that provides a broad scope of how the student is functioning, which impacts the need for assistive technology.  Tr. 351-52.  Dr. Locke also opined that the evaluation of a student in an augmentative communication evaluation should take place in different settings at different times and different days, as was done in the case of McKinney.  Tr. 355, 663-64; see also MDCFL Case No. 390 School District Ex. 40.  She also stated that assessments of augmentative communication needs do not do not usually include trials of the devices.  Tr. 361.  Specifically, first there is a determination as to whether a child needs a device and then, trials, usually lasting longer than 30 days, are conducted to determine what device would be appropriate for a student.  Tr. 361-62.

Based on the School District's use of the SETT procedures, the input of Emery regarding augmentative devices, and the testimony of Dr. Locke, this Court finds that the School District's assistive technology evaluation was appropriate and did not

**2.      Parental Participation**

Emery claims that she was denied equal participation in the formulation process of her son's education.   This Court disagrees.   The record reflects by the preponderance of the evidence Emery's constant participation in the process as well as the School District's frequent solicitation of her input and participation.   The IDEA provides "an opportunity for the parents of a child with a disability . . . to participate in meetings with respect to the identification, evaluation, and educational placement of the child, and the provision of a free appropriate public education to such child."  20 U.S.C. § 1415(b)(1); see also Honig v. Doe, 484 U.S. 305, 311 (1988) (acknowledging "the necessity of parental participation in both the development of the IEP and subsequent assessments of its effectiveness.").   However, parental preference on its own cannot serve as the sole basis for requiring a school district to provide a particular educational plan or service for a child with a disability.  See Blackmon, 198 F.3d at 657-58 (finding that IDEA "does not require school districts simply to accede to parents' demands without considering any suitable alternatives" and that failure to agree on placement does not constitute a procedural violation of IDEA on the part of a school district); Yates v. Charles County Board of Education, 212 F. Supp.2d 470, 472 (D. Md. 2002) ("[P]arents who seek public funding for their child's special education possess no automatic veto over a school board's decision."); 34 C.F.R. Pt. 300 App. A, at 105 ("The IEP team should work toward consensus, but the public agency has ultimate responsibility to ensure that the IEP includes the services that the child needs in order to receive [a free appropriate public education].").

---

deprive McKinney of FAPE.

During the September 22, 1999, IEP meeting, Emery went through her son's previous IEP and outlined to the staff members present what changes she wanted made or items she wanted to be taken out.  Tr. 841, 1142.  She asked a number of questions.  Tr. 841, 1371.  During the meeting, the IEP team members wrote down the goals and objectives as Emery wanted documentation.  Tr. 1140.  When the IEP team went through each goal and objective, she stated whether she thought it was good or whether there were additional items she wanted worked on.  Tr. 185, 1370.  It was Emery's testimony that the IEP team was going through each area of the IEP with "almost a fine tooth comb."  Tr. 1125.

As stated previously, at the end of the of the 3-hour, September 29, 1999 IEP meeting, McKinney's mother alleged that Trepanier, McKinney's case manager, yelled at her when she asked that one-on-one paraprofessional support be written into her son's IEP and stormed out of the room. Tr. 1127-28.   While this testimony is disputed by Trapenier (Tr. 187, 289, 291-92), prior to the alleged outburst by Trapenier, there is nothing in the record to indicate that Emery's participation in the IEP process was being hampered by the School District.  To the contrary, the evidence in the record indicates that Emery was making her concerns and requests known to the rest of the IEP team and that they were taking her concerns into account.   Although Trapenier's alleged outburst may not have been inappropriate, there is nothing in the record that indicates it had a significant impact on the development of the IEP and Emery's participation.  Additionally, the outburst came towards the end of the three-hour IEP meeting and after some of the members of the IEP team had already left.  Tr. 187, 289-92, 1121, 1350; see also Wilson Aff., Ex. 1, FF 21.  This Court also notes that all issues arising out of

the proposed IEP resulting from the September 29, 1999 meeting, were resolved during a conciliation conference.  See Wilson Aff., Ex. 1, FF 23; Tr. 291.

The balance of the record in MDCFL Case No. 390 shows by a preponderance of the evidence that Emery was able to participate in the process as set forth by the IDEA. Emery participated in an IEP meeting on February 8, 2000, as did her legal counsel, and McKinney's private occupational therapist who testified that she was permitted to say anything that was relevant to the meeting. Tr. 1172.   While McKinney's paraprofessional stormed out of this meeting due to criticism, there is nothing in the record to suggest that it had anything to do with Emery.  Tr. 1166.

Further, Emery attended a February 29, 2000 meeting with her advocate.  Tr. 209.  During the meeting, Emery was given a list of the full evaluation that the School District wanted to perform on McKinney, which included a column for assistive technology. Tr. 1177.

On May 15, 2000, a meeting was held that included, among others, the IEP team, a speech clinician, a member of the ACT Team, Emery and her legal counsel.  Tr. 1202, 1199; see also MDCFL Case No. 390  Student Ex. Q.   Emery and her legal counsel participated in the meeting by asking questions and making comments, and Emery was also asked questions from staff members present.  Tr. 222-23, 1272-73. Although the ACT Team did not recommend that augmentative technology be used, the IEP team still decided to try different augmentative communication devices on McKinney based on his mother's requests. See MDCFL Case No. 390 School District Ex. 40, pp. 5, 12; Tr. 623, 869-70.

Emery's complaint that she was not an equal participant in the assistive technology evaluation planning, is belied by the evidence that demonstrates that despite the recommendation of the ACT Team that no augmentative communication device was needed by McKinney, based on Emery's request, two different devices were chosen and used with her son, and she was allowed to designate who could meet in the planning of the device trials, and that she participated in those meetings.  Tr. 60-61, 623-24, 856.

In sum, this Court finds that the preponderance of the evidence supports the findings of the IHO and HRO that the School District's actions did not hamper Emery's ability to participate in the planning of McKinney's education.

### 3.   ESY Services

McKinney asserted that the IHO improperly denied his claim for ESY services for the summer of 2000 because the IHO did not believe she had jurisdiction over the claim as McKinney was going to attend school in Las Vegas, Nevada during the summer. See Pl.'s Mem. at p. 6.  This Court finds that the IHO did not dismiss McKinney's claim based on her lack of jurisdiction over the claim, but on the grounds that it was not up to the School District to ensure the appropriateness of ESY services delivered to McKinney outside of the district.  See Wilson Aff., Ex. 1, FF 113.

Under Minn. R. § 3525.0800, subp. 1, "a pupil's district of residence is responsible for assuring that an appropriate program is provided for all eligible pupils placed by the district's team within the district or in an out-of-district placement

regardless of the method or location of instruction used." (Emphasis added).[22]    Under this rule, if the School District placed McKinney in the Las Vegas School District, it would be the School District's responsibility to ensure that he  had the proper ESY services in Las Vegas.   However, it was not the School District's choice to place McKinney in Las Vegas for ESY services; it was the choice of his parents.

This Court finds that this situation is analogous to that found in Minn. R. § 3525.0800, subp. 8, which provides:

> When a pupil is placed outside of the district residence <u>by the parent</u> or pupil for the purpose of education and in accordance with a statutory education choice enrollment act, the resident district shall be responsible  for assuming the cost of the education program when notified in accordance with Minnesota Statutes, section 127A.47, subdivision 5. <u>The providing district shall be responsible for assuring that an appropriate program is available for the pupil including the notice and hearing provisions</u>.

<u>See also</u> 3525.0800, subp. 7 (emphasis added).[23]

---

[22]    <u>See also</u> Minn. R. § 3525.0800, subp. 4 ("If the <u>resident district places </u>a pupil in an out-of-district placement, the resident district is still responsible to assure that an appropriate IEP is developed, that the pupil is placed in the least restrictive environment, and that due process procedures associated with these responsibilities are followed.").

[23]    3525.0800, subp. 7 also states in relevant part:

> A. District placements: If the  <u>resident district places a pupil</u> for care and treatment, the resident district shall be responsible for providing and paying for an appropriate education program according to this part, either directly or through tuition agreement, and shall also be responsible for the costs associated with care and treatment.

> B. Nondistrict placement:
> (1)<u>When the pupil is placed in a residential facility or foster care by someone other than the resident district</u>, the district in which the facility is located is responsible for providing an

In this case, the School District had already been providing McKinney with ESY services within the District in the summer of 2000.  It was choice of McKinney's parents to send him to Las Vegas for the summer of 2000 for personal reasons.  See Affidavit of Tammy McKinney, ¶ 2, attached to Student's Memorandum in Response to District's Motion for Continuance, Partial Dismissal and Limitation of Timeline.   The School District agreed that it would pay for ESY services that McKinney obtained in Las Vegas. See Affidavit of Caroline Lappin (in Support of School District's Memorandum of Law in Support of Its Motion to the IHO), Ex. 8.   The School Distinct also provided the instructions and overlay[24] of the Techspeak augmentative device to McKinney's parents, and McKinney's father was instructed to request ESY services from the school district in Las Vegas.   Id., ¶ 14, Ex. 9;  see also Affidavit of Judy Trapenier, ¶ 10 (in Support of School District's Memorandum of Law in Support of Its Motion to the IHO).

While it was the School District's obligation to pay for services provided McKinney, it was up to the school district in Las Vegas to ensure that proper ESY services were provided to McKinney.  There is nothing in the record suggesting that the School District agreed to ensure proper ESY services in Las Vegas, nor would it be reasonable to require a school district in one state to attempt to control how another

---

appropriate education program as set forth in statutes and parts 3525.0200 to 3525.4770 including the notice and hearing provisions. The resident district is responsible for assuming the cost of the educational program when notified according to Minnesota Statutes, sections 125A.15 and 127A.47.

(Emphasis added).

[24]    An "overlay" is a piece of paper with the symbols on it that correspond to the phrases that are programmed into the Techspeak device.

school district outside of the state renders services when a student leaves his residential district on his own accord.  As such, this Court finds that the IHO and HRO did not error in concluding that McKinney's ESY claim against the School District regarding ESY services sought to be provided in Las Vegas was appropriately dismissed.

### C.   **MDCFL Case No. 424**

According to McKinney's First Amended Complaint, McKinney alleges that the HRO erred in the following respects: (1) in her description of the issues at the hearing and on appeal; (2) in adopting the IHO's findings of fact, except for No. 10; (3) by excluding Student Exs. 4 and 5; (4) by finding that the state IDEA plan is at Minn. Stat. § 125A.03; (5) in finding that McKinney received a benefit from his education program and that the student's paraprofessionals were adequately trained; (6) in finding that Minn. Stat. § 125.08(b) is consistent with 20 U.S.C. § 1435(c)(3) and finding that a school district is not required to develop a system of comprehensive personal development; (7) in finding that school districts can determine who will provide services for a child with no parental input; (8) in finding that the IHO did not error in sequestering Emery's advocate during the hearing; and (9) by discounting the opinion of the parent concerning the staff's knowledge of an augmentative communication device.  See First Amended Complaint at pp. 5-6, ¶ 11.

The School District has asked this Court to uphold the HRO's decision in MDCFL Case No. 424 in all respects and briefed all of the issue raised by McKinney in his Amended Complaint.  However, in his written submissions to this Court in connection with the cross-motions of the parties, McKinney limited his arguments to the following

issues: (1) the IHO trivialized the testimony of McKinney's mother at the hearing; (2) the HRO erred in concluding that Student Exhibits 4 and 5 were properly excluded; (3) the HRO erred in finding that the substitute paraprofessionals were properly trained; and (4) the IHO improperly excluded Emery's advocate from the hearing.  See Pl.'s Mem, at pp. 26-27; see also Pl.'s Opp. Mem. at pp. 21-22, 24-25.  Therefore, the Court concludes that McKinney abandoned the balance of his claims in his Amended Complaint and will confine its discussion to the four issues addressed by McKinney in her moving papers and in response to the School District's motion.

### 1.   Discounting of Emery's Opinion

McKinney argued that the IHO improperly discounted the opinion of his mother concerning the staff's knowledge of an augmentative communication device.  See First Amended Complaint at pp. 5-6, ¶ 11.  In addition, he has alleged that the IHO's denigration of this mother's opinion has hampered his mother's involvement in his education.  See Pl.'s Mem. at p. 26; Pl.'s Opp. at pp. 23-24.

The testimony at issue involved a question seeking Emery's opinion as to why she believed that McKinney had only made a 2% increase in stating the Pledge of Allegiance without prompting, from the second trimester to the third trimester, when in the second trimester he had made a 7% increase.  Tr. 308-310.   In response to the School District's foundation objection, the IHO overruled the objection, and stated: "Just so you know, it's an opinion of a mother."  After counsel for McKinney pointed out that Emery's opinion was that of a mother who has been to a lot of training and more training than the paraprofessionals, the IHO commented that there could be many things that could cause a small increase, and that he was not sure that there was a standard which

required a student to make the same progress in each trimester.   The IHO then permitted Emery to answer the question, and she testified that "it had a lot to do with training and the change in paras."  Tr. 310.

While opinion testimony by a party or an employee of a party should be evaluated in light of their position in the case, a trier of fact may consider it and give it such weight as appropriate.   See Grant, 2005 WL 1539805 at *16 ("The IHO was entitled to weigh the credibility of each witness and weigh the cumulative testimony in reaching his decision.").

Here, the IHO allowed Emery to give her opinion regarding why her son only made a 2% increase in his ability to say the Pledge of Allegiance over the objections of the School District.   Further, the testimony at issue, taken as a whole, does not show IHO was denigrating the opinion of the mother.   The IHO was attempting to clarify that the opinion was not that of an expert, and that an increase in McKinney's ability or lack of ability could be caused by many factors.   McKinney did not designate his mother as an expert in the field of special education nor has she asserted that she is qualified as an expert.   Her opinion was relevant based on her observations and given her intimate knowledge of her son.   As such, it was properly admitted.   However, the Court does not find that the IHO's statement, to the extent that it suggests the weight to give such testimony, was improper.

In sum, this Court does not find that the IHO disregarded or trivialized the opinion of Emery, nor did his statement affect her ability to participate in the process.

### 2.       Exclusion of Student Exs.  4 and 5

McKinney has objected to the exclusion of Student Exs. 4 and 5. See First

Amended Complaint at pp. 5-6, ¶ 11; see also Pl.'s Mem. at p. 9.

At the end of the due process hearing before the IHO, the School District objected to McKinney's Ex. 4.  Tr. 413.  Exhibit 4 is the Master Agreement between the School District and the Anoka-Hennepin Paraprofessional Association ("Master Agreement").  See MDCFL Case No. 424 Student Ex. 4.  The School District argued that the Master Agreement was not relevant to the case as substitute paraprofessionals are not covered by the agreement, the agreement did not cover the issue of training, and McKinney offered no foundational basis for the document's admission.  Tr. 413. The IHO reserved his decision on the document pending a post-hearing submission from McKinney's counsel.

The School District also objected to McKinney's Ex. 5.  Tr. 418.  Exhibit 5 dealt with the necessary position standards for paraprofessionals in the School District.  See MDCFL Case No. 424 Student Ex. 5.  The School District objected to the admissibility of Exhibit 5 on the grounds there was no testimony on the document and it would not have the opportunity to rebut McKinney's interpretation of the document.  Tr. 418.  In addition, the School District objected to the relevance of Exhibit 5 as to the issue of the training of substituted paraprofessionals under the facts of this case.  Id.  The IHO also reserved his decision on the issue of Exhibit 5.  Tr. 419.

In his post-hearing brief, McKinney asserted that Exhibit 4 is relevant as substitute paraprofessional, Clark, testified that she was not part of the paraprofessional union, which according to McKinney, is "very relevant to how the paraprofessional its treated according to the facts and circumstances of this case."  See McKinney's Post Hearing Brief, MDCFL Case No. 424 at p. 3.  McKinney also argued that Exhibit 5

should be admitted because the testimony of the substitute paraprofessionals was solicited as to their duties with McKinney.  Id.

The IHO made no findings as to the exclusion of Exhibits 4-5 in his decision. Although the HRO found that the IHO erred in failing to determine whether Student Exhibits 4-5 should be excluded, the HRO concluded that the exhibits were irrelevant to the issues in the case and were properly excluded.  See Wilson Aff, Ex. 4 at p. 3; p. 6, ¶ 19.

"[A] court should ordinarily defer to the administrative panel's judgment in building the record . . . ."  See Gill v. Columbia 93 Sch. Dist., 217 F.3d 1027, 1037 (8th Cir. 2000) (citations omitted).  In this case, this Court finds that the HRO did not error by excluding Exhibits 4 and 5 as irrelevant to the issue of training of the substitute paraprofessionals in the use of the DynaMyte.  First, Student Exhibit No. 4, the Master Agreement, makes no reference to the issue of training which is the essential issue in this case.  Second, with regards to Student Exhibit No. 5, the position standard for paraprofessionals, the listed duties carry little relevance to the issue of training on the DynaMyte.  While the standard stated that paraprofessionals may operate learning aids, there is nothing in minimum qualifications portion of the document that states that paraprofessionals must be trained in the areas of learning aids in order to be hired.  The basic qualification is that they have a high school education.

For all the reasons stated above, this Court finds that the HRO did not error in excluding Student Exhibits 4 and 5.

### 3.    Training of Substitute Paraprofessionals

McKinney asserted that the School District deprived him of FAPE when it

assigned him two substitute paraprofessionals not trained in the use of DynaMyte. See Pl.'s Opp. Mem. at p. 21.[25] In particular, McKinney asserted that his IEP required that staff be trained in the use the DynaMyte and that they did not complete their DynaMyte training until approximately a month after they began working with him. Id. The School District argued that record demonstrates that McKinney's substitute paraprofessionals were appropriately trained.[26] See Def.'s Mem. at p. 21.

Minn. Stat. § 125A.08(b) provides that every school district must ensure that:

> [A]nnual training opportunities are available to enable the paraprofessional to continue to further develop the knowledge and skills that are specific to the students with whom the paraprofessional works, including understanding disabilities, following lesson plans, and implementing follow-up instructional procedures and activities . . . .[27]

With regards to McKinney's 2000-01 school year, his IEP required that he receive one-on-one paraprofessional services. See MDCFL Case No. 424 School District Ex. 2. McKinney was using a DynaMyte during the 2000-01 school year as an augmentative communication device. Tr. 30.

---

[25] McKinney did not make any argument on this claim in his Motion for Judgment in his favor.

[26] The School District also argued that it provided McKinney FAPE, in response to Emery's objection at the due process hearing to Goal 5 of his IEP, which related to his use of DynaMyte. McKinney did not raise this argument in his submission, nor address it in his response.

[27] This Court rejects any assertions that Minn. Stat. § 125A.08(b) is inconsistent with 20 U.S.C. § 1453 as § 125A.08(b) deals with a school district's obligations for training paraprofessionals, while § 1453 deals with the obligation of states to have a plan in place that identifies and addresses the needs for personnel preparation and development.

On March 13, 2001, Nehring communicated to Emery that her son's paraprofessional, Peters, had accepted another position and would be leaving Andover Elementary School.  Tr. 31; see also MDCFL Case No. 424 School District Ex. 3. According to Nehring, she did not believe that the school could find a full-time replacement for Peters for the rest of the year, but she knew she would be able to obtain the assistance of substitutes.  Tr. 32; see also MDCFL Case No. 424 School District Ex. 4.   DeVries and Clark were selected to be McKinney's substitute paraprofessionals.  Id.

Prior to beginning working with McKinney, the plan was to train the substitute paraprofessionals in the use of DynaMyte with Sutterlund, who had been trained in the use of the DynaMyte, and for them to spend time with Peters to go through McKinney's day-to-day activities.  Tr. 32, 88-91.  McKinney's IEP also provided that the School District would "attempt to enroll Mathew's paraprofessional in training done by DynaVox. Enrollment depends on class availability."  See MDCFL Case No. 424 School District Ex. 2 at p. 12; Tr. 87.

On March 20, 2001, Emery requested an IEP meeting regarding the change in her son's paraprofessional. See MDCFL Case No. 424 School District Ex. 3; Tr. 32-33. The School District arranged for an IEP meeting to discuss the transition plan for McKinney's paraprofessionals.  Tr. 33.  On March 23, 2001, Emery sent a letter to the School District asking that the two new substitute paraprofessionals be given two days of training each with Peters and that they attend DynaMyte training with DynaVox.  See MDCFL Case No. 424 School District Ex. 4.  Peterson responded in a March 23, 2001 letter to Emery that the new substitute paraprofessionals would each be given two days

of training with Peters and that the School District would see about sending them to the April 9, 2001 DynaVox training.  See MDCFL Case No. 424 School District Ex. 5; Tr. 34-35.

Before working with McKinney, the two substitute paraprofessionals followed Peters while she working with McKinney for two days.  Tr. 157-58, 207.  Peters showed them how to add in spelling words on the DynaMyte, where the speech controls were, how to pull up different pages and complete documentation as required by the IEP.  Tr. 162-63, 207-08.   On March 30, 2001, Sutterlund trained the substitute paraprofessionals in using the DynaMyte, how to do some programming, and how to keep data on the device.  Tr. 136, 161, 209-10.  Subsequently, he encouraged them to use the DynaMyte in responding to questions and using the device in social situations.  Tr. 137.

The School District also attempted to enroll DeVeries and Clark in a DynaVox training seminar for the DynaMyte scheduled for April 9, 2001, however, both were unable to attend due to family conflicts.  Tr. 94.  The next available date for the training was May 18, 2001.  Both substitute paraprofessionals attended this session. Tr. 94, 165, 209.

DeVries began her work with McKinney on April 16, 2001 and Clark began working with McKinney on April 17, 2001.  Tr. 220-21.  Sutterlund testified that he was available anytime during the school day if the substitute paraprofessionals had any questions relating to the use of the DynaMyte and that the paraprofessionals did utilize him in a non-emergency situation when they had some issues with programming the device.   Tr. 141-43.

This Court finds that the preponderance of the evidence supports the finding that the School District complied with its responsibilities under the IEP and Minn. Stat. § 125A.08(b) by providing McKinney's substitute paraprofessionals sufficiently training in the use of the DynaMyte before working with him.  The School District was able to secure paraprofessional help for McKinney on short notice towards the end of the school year.  In addition, in compliance with Emery's requests, the School District had each substitute paraprofessional train with McKinney's out-going paraprofessional, Peters, while she was still working with McKinney.  Peters also trained the substitute paraprofessionals in the use of the DynaMyte.  In addition, Sutterlund, who had been formally trained in the use of the DynaMyte, also trained the substitute paraprofessionals in the use of the DynaMyte prior to working with McKinney.  Despite Emery's assertion as to Sutterlund's competency in the use of the DynaMyte, the preponderance of the record supports a finding that he was sufficiently knowledgeable in the use of the DynaMyte to provide the substitute paraprofessionals with training on the device.  Further, Sutterlund was available to consult with the substitute paraprofessionals if any concerns arose and the evidence shows that the paraprofessionals did consult him with questions.

While the IEP requires that paraprofessionals be enrolled in training done by DynaVox, it also stated that "[e]nrollment depends on class availability."  See MDCFL Case No. 424 School District Ex. 2 at p. 12.  The evidence in the record shows that the School District attempted to enroll the substitute paraprofessionals in DynaVox training before they began working with McKinney, but due to circumstances outside of the control of the School District, the substitute paraprofessionals were not able to attend.

The paraprofessionals did attend the next available training on May 18, 2001.   In sum, this Court finds that the School District fulfilled its obligation to train McKinney's paraprofessionals in the use of the DynaMyte.[28]

This Court also finds that the one-month delay between the substitute paraprofessionals starting with McKinney and their classroom training with the DynaVox Company did not deprive McKinney of FAPE.   According to Emery, the main issue in the case was Goal Number 5 of the IEP, which provides, "Matthew will improve his social skills in the areas of peer interactions and self-control from depending on verbal prompt to an independent level."   Tr. 386; see also MDCFL Case No. 424 School District Ex. 2 pp. 6-7.   As stated previously, the objective of Goal Number 5 included: (1) using the DynaMyte, McKinney would increase his independent interactions with peers by three interactions per week; (2) using the DynaMyte, McKinney will tell a peer what he did the night before without prompts 80% of trials; (3) using the DynaMyte, McKinney would say the Pledge of Allegiance without prompts; (4) while McKinney was learning the DynaMyte, his paraprofessional would practice with him at least 2 times a day with a

---

[28]     To the extent that the McKinney had alleged that the substitute paraprofessionals were not trained outside of the issue of the DynaMyte, this Court finds that the IHO did not error in finding that training issues not related to the DynaMyte had not been plead with specificity and were deemed waived under Minn. Stat. § 125A.09, subd. 6.   See Wilson Aff., Ex. 3 at p. 9.   "At the time of the due process hearing, Minnesota law required the party requesting a hearing to 'plead with specificity as to what issues are in dispute and all issues not pleaded with specificity are deemed waived.'"   See Grant, 2005 WL 1539805 at *15 (quoting Minn. Stat. § 125A.09, subd. 6 (repealed 2003)). Emery's notice for due process hearing only addressed the issue of training with regards to the DynaMyte and therefore, the IHO did not error in finding any other training issues with regards to the substitute paraprofessionals had been waived by McKinney.   See MDCFL Case No. 424 School District Ex. 4.

100% accuracy; and  (5) that McKinney would decrease his target behaviors.  See MDCFL Case No. 424 School District Ex. 2 at p. 6.

A comparison of McKinney's IEP progress report for his second trimester for the 2000-01 school year with his IEP progress report for his third trimester shows that he made overall progress as it relates to Goal Number 5 of the IEP.  McKinney made progress in the number of interactions per day he had with peers.  See MDCFL Case No. 424 School District Ex. 7 at p. 7, Ex 18.  In addition, McKinney increased the amount he shared with his peers as to what he had done the night before, increased his ability to participate on the Pledge of Allegiance, and increased the number of times per day that he used the DynaMyte.  Id.  The only decreases occurred in  the areas of independent interactions with peers (decrease of 2%) and in the utilizing of the DynaMyte without any prompts during trials (decrease of 12%).  Id.

Further, the McKinney's progress between the May 2000 and May 2001 shows that he made progress in the areas of word identification, passage comprehension, calculation, applied problems, dictation, writing, broad reading, math and written language, all demonstrating he received an educational benefit from the services provided by the School District for the 2000-01 school year.  See MDCFL Case No. 424 School District Exs. 1 at p. 2, Ex. 14 at p. 4.  Moreover, McKinney's mother acknowledged during the hearing that he had made progress during the last trimester of the 2000-01 school year in the areas of speech, math, reading, and occupational therapy.  Tr. 384.

In conclusion, the preponderance of the evidence demonstrates that McKinney received a meaningful educational benefit from the School District during 2000-01

school year and during the last trimester of the year.  See Blackmon, 198 F.3d at 658

(finding that the IDEA does not require a school district to maximize a student's potential

or provide the best possible education, but that IDEA's requirements are satisfied when

a school district provides individualized education and services sufficient to provide

disabled children with "some educational benefit.") (citing  Rowley, 458 U.S. at 200; Fort

Zumwalt Sch. Dist. v. Clynes, 119 F.3d 607, 612 (8th Cir. 1997), cert. denied, 523 U.S.

1137 (1998)).    As such, this Court concludes that the training of the substitute

paraprofessionals did not deny McKinney FAPE.

### 4.    Sequestering of ARC Advocate

McKinney argued that the IHO in MDCFL Case No. 424 improperly excluded her

advocate, Grieser, from being present during the due process hearing.  See Pl.'s Mem.

at p. 27.  The School District moved to sequester Grieser during testimony as she was

listed as fact witness by McKinney.  Tr. 5-7.  The IHO agreed with the School District

and sequestered Grieser.

A party to a due process hearing under the IDEA has the right to be

"accompanied and advised by counsel and by individuals with special knowledge or

training with respect to the problems of children with disabilities."   34 C.F.R §

300.509(b)(1).   However, parties to a due process hearing also have the right to

"present evidence and confront, cross-examine . . . witnesses."   34 C.F.R §

300.509(b)(2).  In addition, Minn. R. 3525.4300, Subp. 7 provides that "[a]t the request

of a party or upon the hearing officer's own motion, the hearing officer may exclude

witnesses from the hearing room so that they cannot hear the testimony of other

witnesses."[29]   While Emery had a right to have an advocate with her during the due process hearing, she cannot use this right as means to control the School District's ability to properly cross-examine and confront the advocate who is fact witness.  In this case, Emery's advocate was listed as a fact witness and the IHO properly sequestered her in order to prevent her from hearing the testimony of other witnesses and tailoring her testimony to their testimony.  As such, this Court finds that the IHO and HRO did not error in finding that the sequestering of Emery's advocate was appropriate under the circumstances.

### RECOMMENDATION

For the reasons set forth above and based on all the files, records, and proceedings herein, IT IS RECOMMENDED that:

1.      Defendant's Motion for Judgment on the Administrative Record/Summary Judgment [Docket No. 79] be **GRANTED**; and

2.      Plaintiff's Motion for Judgment in Favor of the Plaintiff on an Expanded Record or to Set Matter for Trial [Docket No. 90] be **DENIED**.

Dated:        August 16, 2005

                              s/ *Janie S. Mayeron*
                              JANIE S. MAYERON
                              United States Magistrate Judge

Pursuant to Local Rule 72.1(c)(2), any party may object to this Report and Recommendation by filing with the Clerk of Court, and by serving upon all parties on or before **August 29, 2005** a copy of this Report, written objections which specifically identify the portions of the Report to which objections are made and the bases for each objection.

---

[29]      This Court notes that Rule 615 of both Federal Rules of Evidence and the Minnesota Rules of Evidence allow a witness to be sequestered at the request of another party so that they cannot hear the testimony of other witness.